NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230256-U

NOS. 4-23-0256, 4-23-0257, 4-23-0258 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 1, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* T.J, G.J., and O.J., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
|       Petitioner-Appellee, | ) | Nos. 20JA69 |
| | ) |     20JA70 |
|       v. | ) |     20JA71 |
| Amanda J., | ) | |
|       Respondent-Appellant). | ) | Honorable |
| | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Harris and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding respondent was unfit under section 1(D)(m) of the
Adoption Act (750 ILCS 50/1(D)(m) (West 2022))) was not against the manifest
weight of the evidence and the court did not err by admitting service plans into
evidence.

¶ 2    Respondent, Amanda J, is the mother of T.J. (born May 2013), G.J. (born June

2016), and O.J. (born August 2020). In February 2023, the trial court found respondent was an

unfit parent under the Adoption Act (see 750 ILCS 50/1(D)(m)(i), (ii) (West 2022)) and that

termination of respondent's parental rights was in the children's best interests. (The children's

father is deceased and not a party to the appeal.)

¶ 3    Respondent appeals, arguing, among other things, that the trial court's fitness

findings were against the manifest weight of the evidence—specifically, the findings that she

failed (1) to correct the conditions that were the basis for the children's removal and (2) to make reasonable progress toward the return of the children in any nine-month period following the adjudication of neglect of the children. Respondent does not appeal the court's finding that termination of her parental rights was in the children's best interests. We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5                    A. The Petition for Adjudication of Wardship

¶ 6            In August 2020, the State filed petitions for adjudication of wardship for each minor child, alleging respondent neglected the children under section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2020)) because the children's environment was injurious to their welfare due to (1) respondent's substance abuse and (2) exposure to domestic violence. That same day, the trial court entered an order placing temporary custody of the minors with the Illinois Department of Children and Family Services (DCFS).

¶ 7            In January 2021, following a hearing, the trial court entered an adjudicatory order finding the children neglected. In March 2021, the court conducted a dispositional hearing and found respondent unfit and unwilling for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minors because of "lack of efforts/progress." The court also made the children wards of the court and placed custody and guardianship of the children with the guardianship administrator of DCFS.

¶ 8                    B. The Petitions for Termination of Parental Rights

¶ 9            In May 2022, the State filed petitions for termination of parental rights, alleging respondent was unfit under section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2022)) because she failed to make (1) reasonable efforts to correct the conditions which were the basis for the removal of the children and (2) reasonable progress toward the return of

the children within any nine-month time period after they were adjudicated neglected—namely, (a) January 29, 2021, to October 21, 2021 and (b) October 21, 2021, to July 21, 2022.

¶ 10                          C. The Termination Proceedings

¶ 11          In January 2023 and February 2023, the trial court conducted hearings on the State's termination petitions. Respondent did not appear at the January hearing date.

¶ 12                1. *The Fitness Portion of the Termination Proceedings*

¶ 13                          a. Jerilyn Niewohner

¶ 14          Jerilyn Niewohner, a retired caseworker at DCFS, testified she oversaw the case from August 2020 until she retired in September 2021. Niewohner testified that she created a service plan for respondent starting in August 2021 through February 2022. However, she later clarified the plan covered the preceding six months and included tasks yet to be completed through February 2022.

¶ 15          The plan showed tasks with start dates in August 2020 and showed those were evaluated in February 2021. It then listed the tasks continuing until August 2021. Niewohner testified service plans were created in the normal course of DCFS business and correctly indicated the progress of the parents during the period covered by the plan. The plan was admitted into evidence as the State's exhibit No. 2 without objection.

¶ 16          Niewohner testified the service plan required respondent to engage in the following tasks: (1) cooperation, (2) parental education, (3) employment, (4) mental health, and (5) substance abuse. Regarding cooperation, Niewohner rated respondent unsatisfactory because she had not cooperated with obtaining either a substance abuse assessment or a mental health assessment. Respondent also had ongoing parent education services, but it took six to nine months before she began to do anything in her plan. Respondent was rated unsatisfactory on her

employment task because, although she said she was working for her landlord, she never provided proof of employment.

¶ 17    Niewohner rated respondent unsatisfactory on the mental health task because respondent took nine months to obtain an assessment. Niewohner testified as follows about that task:

> "[A]fter nine months, she finally went to [a provider] to do an assessment. She did not report any kind of mental health issues or concerns, however, when we completed an integrated assessment at the beginning of the case, she reported some stress and some—I can't recall what that integrated assessment—but they recommended mental health services. So it was like she was telling them something different, and then she did an assessment and told them something different, so it was rated unsatisfactory ***."

Niewohner stated there was no recommendation for follow-up treatment in the mental health assessment and admitted she did not have evidence respondent was suffering from mental health issues. However, DCFS recommended respondent get another assessment somewhere else.

¶ 18    Niewohner rated respondent unsatisfactory on her substance abuse task because she again took nine months to obtain an assessment and did not report to the assessor that she had previously tested positive for amphetamines. Niewohner further stated:

> "She reported to the *** screener that she's never used illegal drugs and she doesn't understand why DCFS has reported that she had positive tests. So basically, she said she does not need any services and she's never used illegal drugs.

Also, as a part of the substance assessment part in the service plan she was required to do drug drops randomly. Sometimes they were scheduled. That was unsatisfactory. She missed several. I have never had a positive drug screen on her, but I would say she missed at least 50 percent of the time."

Notes in the service plan stated respondent "failed to cooperate with requested random drug screens except one [in November 2020], which was negative for any illegal substances. [Respondent] failed 12 requested drug screens." When asked if respondent displayed visible signs of using substances, Niewohner testified it was "hard to say." She noted respondent was very thin and had unaddressed medical issues. Respondent was requested to seek medical care and allow DCFS to talk to the doctor. However, respondent never provided the name of a doctor or any medical releases. Respondent was rated satisfactory on her domestic violence, suitable housing, and visitation tasks. Visitation was supervised and concerns related to visitation were addressed quickly.

¶ 19                                  b. Angie Danzeisen

¶ 20          Angie Danzeisen testified she was assigned as the caseworker on the matter in September 2021 after Niewohner retired. She remained the caseworker until June 2022. Danzeisen prepared and evaluated a service plan dated February 16, 2022, that "covered the prior six months up and to this point." The plan was prepared in the ordinary course of DCFS business and accurately recorded the progress of the parents during the period covered by the plan. The plan showed the same tasks started in August 2020 as shown in State's exhibit No. 2, listed a target completion date of August 2022, and was evaluated in February 2022.

¶ 21 Danzeisen rated respondent unsatisfactory on her cooperation task because she did not cooperate with recommended services, failed to meet with a caseworker monthly, and failed to attend scheduled team meetings. Respondent provided limited proof of employment.

¶ 22 Regarding the mental health and substance abuse tasks, respondent again was rated unsatisfactory because she was not truthful in the initial assessment and did not complete the requested second assessment. Respondent also did not follow up with treatment or complete all required drug screens. Danzeisen testified respondent tested negative on the drug screens that she did complete. Respondent told Danzeisen she received services but failed to provide releases to substantiate her claims.

¶ 23 Respondent's visitation had been suspended because their father would show up when he was not supposed to be there, causing conflicts with the children. Danzeisen stated "visitation became more traumatizing than helpful for the kids. Therefore, it was suspended through the court." Respondent and the children's grandmother also tried to reach out to the children on social media and went to their school when they were not permitted to do so.

¶ 24 Danzeisen rated respondent satisfactory on her domestic violence and parenting education tasks, but Danzeisen explained that completing those services was insufficient to recommend return of the children to respondent. Danzeisen was unable to view respondent's home because when she went there, both announced and unannounced, respondent did not open the door. Respondent also failed to respond to calls and texts.

¶ 25 c. Alison Ketsenburg

¶ 26 Alison Ketsenburg supervised respondent's case for DCFS. She testified she was familiar with events occurring in the case after February 2022. When asked questions concerning

whether respondent had made any further progress or advanced in her tasks, Ketsenburg often generally stated, "[N]ot that I'm aware of."

¶ 27                              d. The Trial Court's Findings

¶ 28        The trial court found the State proved by clear and convincing evidence that respondent neither (1) made reasonable efforts nor (2) reasonable progress, as alleged in the petition. The court noted there was no evidence respondent sought to have visitation reinstated after it was suspended, and she failed to engage in all services recommended by the service plans. The court further noted that respondent did not allow or arrange for a caseworker to visit her home for one six-month period, visitations were never unsupervised, and visitations were suspended "because they were doing more harm to the minors than good."

¶ 29        2. *The Best-Interest Portion of the Termination Proceedings*

¶ 30        In February 2023, the trial court conducted the best-interest portion of the termination proceedings. At the conclusion of the hearing, the court found the State proved by a preponderance of the evidence it was in the best interests of the children to terminate parental rights and changed the goals of their cases to adoption or guardianship.

¶ 31        This appeal followed.

¶ 32                              II. ANALYSIS

¶ 33        Respondent appeals, arguing, among other things, that the trial court's fitness findings were against the manifest weight of the evidence—specifically, the findings that she failed (1) to correct the conditions that were the basis for the children's removal and (2) to make reasonable progress towards the return of the children in any nine-month period following the adjudication of neglect of the children. Respondent does not appeal the court's finding that termination of her parental rights was in the children's best interests. We disagree and affirm.

¶ 34          A. The Trial Court's Fitness Determinations

¶ 35          Here, the trial court found respondent both failed (1) to make reasonable efforts to correct the conditions that were the basis for the children's removal and (2) to make reasonable progress toward the return of the children in any nine-month period following the adjudication of neglect of the children. Because we conclude that the record supports the court's findings that respondent did not make reasonable progress towards the return of the minors during either nine-month period—namely, (1) January 2021 through October 2021 and (2) October 2021 through July 2022—we address only that ground for unfitness. See *In re Y.F.*, 2023 IL App (1st) 221216, ¶ 47 ("A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence.").

¶ 36          1. *The Applicable Law and the Standard of Review*

¶ 37          a. The Law Regarding Reasonable Progress

¶ 38          The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28, 115 N.E.3d 102. Section 1(D)(m)(ii) of the Adoption Act defines an unfit parent as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2022). The Illinois Supreme Court has held that "[t]he benchmark for measuring a parent's reasonable progress under section 1(D)(m) of the Adoption Act encompasses compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re K.P.*, 2020 IL App (3d) 190709, ¶ 36, 157 N.E.3d 493 (citing *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001)).

¶ 39    Likewise, this court has defined "reasonable progress" as follows:

"'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

See also *K.P.*, 2020 IL App (3d) 190709, ¶ 36.

¶ 40                              b. The Standard of Review

¶ 41    A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. "A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 48, 187 N.E.3d 763. "A trial court's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30, 125 N.E.3d 444.

¶ 42                              2. *This Case*

¶ 43        The record shows that during the nine-month periods, (1) caseworkers consistently rated respondent unsatisfactory on multiple tasks required by her service plan, (2) respondent failed to perform all requested drug tests or obtain proper mental health and substance abuse assessments, and (3) respondent did not allow caseworkers to view her residence. Further, as the trial court noted multiple times, none of the evidence presented even suggested that respondent made any efforts to resume visitation with the children after it was suspended in April 2022, and all the visitations prior to that date were supervised.

¶ 44        Respondent contends that the evidence was vague or unreliable—for example, respondent points to (1) Niewohner's testimony that she thought respondent signed up for services and could not recall whether respondent had mental health issues and (2) Ketsenburg's answering questions with the statement "not that I'm aware of." However, the trial court was in the best position to evaluate the credibility of the witnesses' testimony, and we will not reweigh that evidence on appeal. See *In re adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11, 143 N.E.3d 805.

¶ 45        Because the record shows that respondent failed to (1) comply with the tasks in her service plans or (2) make efforts to resume visitation with her children, the trial court reasonably found that the children were unlikely to be returned to respondent's custody in the near future. Accordingly, we conclude that the court's findings that respondent failed to make reasonable progress during any nine-month period toward the return of the children were not against the manifest weight of the evidence.

¶ 46                                B. Forfeited Arguments

¶ 47        Respondent also argues that the trial court's unfitness findings were against the manifest weight of the evidence because (1) they were based on improperly admitted service

plans, which lacked foundation for their admission into evidence, and (2) the State failed to prove the nine-month periods at issue. However, because respondent neither made contemporaneous objections to (1) the admission of the service plans into evidence nor (2) the use of the nine-month periods of January 2021 through October 2021 and October 2021 through July 2022, she forfeited those arguments, and we need not address them on appeal. See *In re M.P.*, 2020 IL App (4th) 190814, ¶ 44, 155 N.E.3d 577 ("A [respondent] forfeits an issue for purposes of appellate review by failing to object to the alleged error or raise it in a written posttrial motion.").

¶ 48                                    III. CONCLUSION

¶ 49           For the reasons stated, we affirm the trial court's judgment.

¶ 50           Affirmed.